UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 20-CV-1957

| | |
|---|---|
| Graciela CISNEROS, ) | |
| ) | |
| Plaintiff, ) | COMPLAINT |
| ) | SEEKING |
| v. ) | MONEY DAMAGES |
| ) | |
| CITY OF MINNEAPOLIS, a ) | DEMAND FOR |
| municipal entity; OFFICER DOE #1, in) | JURY TRIAL |
| their *individual* capacity; OFFICER ) | |
| DOE #2, in their *individual* capacity; ) | |
| and, OFFICER DOE #3, in their ) | |
| *individual* capacity, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>GENERAL INTRODUCTION</u>

1.    This is an action under 42 U.S.C. § 1983 seeking money damages as

compensation for Defendants' violation of Plaintiff's constitutional

rights under the First, Fourth, and Fourteenth Amendments to the

United States Constitution.

2.    This action also states common law battery and negligence claims

pursuant to MINN. STAT. § 466.02 against three police officers whose

identities are not yet known, but who are referred to in this Complaint

as Officer Doe #1, Officer Doe #2, and Officer Doe #3 (collectively,

"Officer Does" or "Defendant Does") in their individual *and* official

capacities (differentiated by claim), and against the City of

Minneapolis, Minnesota for the actions of its agents and employees Minneapolis Mayor Jacob Frey, Minneapolis Police Chief Medaria Arradondo, and the three heretofore unidentified Officer Does.

3.    Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343 and claim joinder is appropriate under Fed. R. Civ. P. 18.

4.    It is alleged that on May 30, 2020, one or more of Defendant Does, engaged in an action which resulted in the unreasonable seizure of Plaintiff, thereby violating her rights under the Fourth Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, as well as her rights to due process under the Fourteenth Amendment.

5.    Defendants violated Plaintiff's constitutional rights because of, *inter alia*, the policies or customs of the City of Minneapolis and the Minneapolis Police Department, under the supervision of Minneapolis Police Chief Medaria Arradondo and Minneapolis Mayor Jacob Frey.

6.    On May 29, 2020, Defendant City of Minneapolis, through Minneapolis Mayor Jacob Frey, engaged in action that unconstitutionally deprived Plaintiff of her rights under the First Amendment to speak and assemble, as made applicable to the states through the Fourteenth Amendment, and of her right to be present in public under the Fourteenth Amendment.

7.   In enforcing the Mayor's actions on May 30, 2020, Defendant City of Minneapolis, through its agents, including Police Chief Medaria Arradondo and Defendant Does, unconstitutionally deprived Plaintiff of her rights under the First Amendment to speak and assemble, as made applicable to the states by the Fourteenth Amendment, and of her right under the Fourteenth Amendment to be present in public.

8.   Defendant Does 1, 2, and/or 3 committed a common law battery against Plaintiff for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02 and/or MINN. STAT. § 3.736.

9.   Defendant Does 1, 2, and 3 breached their duty of reasonable care to (1) forgo shooting Plaintiff in the face and (2) conduct the arrest of Plaintiff in a constitutionally permissible manner. Defendant Does breached this duty by discharging their "less lethal" firearms in her direction in an act of common law negligence for which the City of Minneapolis must assume liability pursuant to MINN. STAT. § 466.02 and/or MINN. STAT. § 3.736.

## **PARTIES**

### **Plaintiff: Graciela Cisneros**

10.   Plaintiff Graciela Cisneros [hereinafter "Grace"] was amongst those who assembled to peacefully protest the killing of George Floyd on May 30, 2020.

11.   Grace is a twenty-one-year-old college student residing in Eagan, Minnesota. At the time of the incident giving rise to this Complaint, Grace lived in Saint Paul, Minnesota.

12.   Grace has no criminal record, was born in San Luis Obispo, California, and has been a United States citizen since birth.

### Defendant: City of Minneapolis

13.   Defendant City of Minneapolis [hereinafter "Minneapolis"] is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota.

14.   The Minneapolis Police Department [hereinafter "MPD"] is a local government entity and an agency of Defendant Minneapolis, and all actions of the MPD are the legal responsibility of Minneapolis.

15.   Minneapolis is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal rights claims.

16.   Minneapolis Mayor Jacob Frey [hereinafter "Frey"] is and was at all times relevant to this action, the Mayor of Minneapolis and the chief policymaker responsible for implementing curfew orders and authorizing MPD's use of force.

17.  Minneapolis Police Chief Medaria Arradondo, [hereinafter "Arradondo"] is and was, at all times relevant to this action, the MPD police chief and a policymaker for his department.

**<u>Defendants: Minneapolis Officer Does 1, 2, and 3</u>**

18.  Grace is informed, believes, and thereupon alleges that Officer Does 1, 2, and 3 were the agents, servants, and employees of Defendant Minneapolis and/or the MPD.

19.  These individuals were likely members of the MPD, though they may have been operating in Minneapolis at the direction of the Mayor and Governor under the auspices of another law enforcement agency.

20.  Grace does not yet know the true names and capacities of Defendants sued herein as Does 1, 2 and 3, and therefore sues these Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

21.  All individual Doe Defendants are sued in both their individual and official capacities.

22.  For purposes of Plaintiff's claims under 42 U.S.C. § 1983, Doe Defendants are sued in their *individual* capacity. While Plaintiff also faults Doe Defendants' for the actions they performed in their *official* capacity, these harms are imputed to the City of Minneapolis and need not be realleged.

23. For purposes of Plaintiff's state law claims, Doe Defendants are sued in their *official* capacity only.

24. Grace is informed, believes, and thereupon alleges that at all times relevant hereto, Doe Defendants 1, 2, and 3, in addition to the named Defendants, are responsible in some manner for the damages and injuries alleged herein.

25. Grace is informed, believes, and thereupon alleges that at all times relevant hereto Defendants, and each of them, were the agents, servants and employees of Defendant Minneapolis and were acting at all times within the scope of their agency and employment and with the knowledge and consent of their principal and employer.

26. At all times Defendants were acting under color of state law.

27. Grace is informed, believes, and thereupon alleges that the practices, policies, and customs of Minneapolis and/or the MPD caused the unlawful action taken against Grace.

## **JURISDICTION**

28. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 42 U.S.C. §§ 1983, 1988. Supplemental jurisdiction over state claims is appropriate as the events in question "derive from a common nucleus of

operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

## VENUE

29. Venue properly lies in the District of Minnesota pursuant to 28 U.S.C. § 1391(e)(1) because all the events giving rise to this claim occurred in this district, all Defendants reside in this district, and no real property is involved in this action.

## FACTUAL BACKGROUND

30. On May 25, 2020, Minneapolis Police Officer Derek Chauvin knelt on George Floyd's neck for more than eight minutes as Mr. Floyd's life slowly slipped away. Despite Mr. Floyd's pleas for help and the protestations of onlookers, Officer Chauvin and two other officers, held him on the ground, handcuffed behind his back, until well after he completely stopped moving while a fourth officer prevented bystanders from intervening to save Mr. Floyd's life. Mr. Floyd was murdered on the street in Minneapolis. He was suspected of having attempted to pass a counterfeit $20 bill. These officers have since been indicted for aiding or abetting murder in the second degree in violation of MINN. STAT. § 609.19.

31. On May 26, 2020, thousands of Minneapolis residents took to the city's public streets and spaces to protest the unjustifiable killing of Mr.

Floyd, as well as police killings of other people of color. As city officials acknowledged, the vast majority of these protestors exercised their First Amendment rights in a forthright, peaceful, and lawful manner.

32. On the evening of May 27, 2020, the Minneapolis Fire Department responded to a number of fires that occurred in the vicinity of the Third Precinct along Lake Street near the intersection with Hiawatha Avenue. Mayor Frey responded by declaring a state of emergency, citing fires and unrest in the Third Precinct and surrounding area.

33. On May 28, 2020, the Fire Department again responded to a number of fires along Lake Street in the vicinity of the Third Precinct. Several additional fires also broke out in the vicinity of Broadway Avenue on the city's north side.

34. In total, all the building fires experienced throughout Minneapolis, and the vast majority of the property crimes that prompted the order, were confined to two discrete areas around Lake Street on the south side, and Broadway Avenue on the north. Together, these areas constituted about four of Minneapolis' fifty-eight square miles.

35. Over the full period in which the curfews were in effect, and the two days prior, half of Minneapolis' eighty-seven neighborhoods experienced no fire activity, protest related or otherwise.

36.   Fifty-three of Minneapolis' eighty-seven neighborhoods experienced no building fires.

37.   On May 29, 2020, Mayor Frey issued Emergency Regulation 2020-2-1, implementing a city-wide curfew between the hours of 8:00 PM on May 29, 2020 and 6:00 AM on May 30, 2020, and between the hours of 8:00 PM on May 30, 2020 and 6:00 AM on May 31, 2020.

38.   This order, in tandem with subsequent but similar measures, ultimately mandated that all Minneapolis residents throughout the city stay off the streets for seven consecutive evenings despite the fact that the fires and unrest that prompted the orders were largely confined to two relatively small areas, one along Lake Street, miles south of downtown, and the other centered on Broadway Avenue on the city's north side.

39.   In issuing the order, officials acknowledged that peaceful protestors would be caught up in the enforcement and indicated that anyone out beyond the curfew would be treated as if they were aiding and abetting those seeking to do property damage.

40.   Minneapolis officials characterized the outright criminalization of First Amendment activity, and MPD's violent enforcement of the curfew order, as necessary to restore order.

41. At the time Mayor Frey issued Emergency Regulation 2020-2-1, he acted under the color of the statutes, ordinances, regulations, customs, and usages of Defendant Minneapolis and the State of Minnesota under the apparent authority of his office as Mayor and MINN. STAT. § 12.29.

## The Shooting of Graciela Cisneros

42. Plaintiff Grace attended one of the protests in the aftermath of Mr. Floyd's senseless slaying in an effort to exercise her constitutional rights to assemble in order to make known and voice her displeasure with the violence perpetrated by MPD officers against people of color and particularly against African American men.

43. Grace attended this protest with her partner Ricardo Ramos Jr. [hereinafter "Ricardo"], who sought the same peaceful yet powerful aims as Grace.

44. Grace was injured by police officers on May 30, 2020.

45. In the days leading up to May 30, 2020, Grace and Ricardo had previously attended daylight protests and helped to clean up damaged buildings on Lake Street.

46. Grace and Ricardo were unable to attend daylight protests on May 30, 2020 due to scheduling concerns stemming from Grace's employment obligations.

47.     Grace and Ricardo did not carry signs on May 30, 2020, but they did chant, march, and otherwise seek to demonstrate their political beliefs regarding the need for police reform in conjunction with others on May 30, 2020.

48.     On May 30, 2020, Grace and Ricardo departed their home in St. Paul, at or around 6:30 PM, after Grace finished work for the day.

49.     Grace and Ricardo parked near the Himalayan Restaurant, located at 2910 E Lake Street, at approximately 7:06 PM. The couple planned to attend the protest near the intersection on Lake Street and Hiawatha Avenue for a brief time and then depart and return home.

50.     Upon their arrival at the intersection of Lake Street and Hiawatha Avenue, Grace and Ricardo learned the protest had moved west down Lake Street and they progressed towards the larger group of protesters assembled near the intersection of Nicollet Ave and Lake Street.

51.     When Grace and Ricardo arrived at the intersection of Nicollet Avenue and Lake Street, at or around 7:40 PM, Grace and Ricardo decided to stay a bit longer given that the protests were peaceful and respectful in nature.

52.     Grace and Ricardo based their decision on the fact that they had just arrived and this period of the day marked the only time they were able to protest given Grace's work obligations.

53.   Grace and Ricardo sat with protestors for around 20 minutes.

54.   At or around 8:00 PM, Grace and Ricardo joined a protest march that progressed north along Nicollet Avenue towards Loring Park.

55.   If Mayor Frey's emergency regulation, or Minnesota Governor Tim Walz's Emergency Exec. Order No. 20-65, were themselves lawful, Grace and Ricardo's presence on the street after 8:00 PM was punishable as a misdemeanor by up to ninety days in jail or a $1,000 fine. *See* MINN. STAT. § 12.45; MINNEAPOLIS, MINN., CODE OF ORDINANCES § 1.30.

56.   As the protestors chanted and marched north on Nicollet, unidentified police officers approached the group in squad cars and fired rubber bullets and paint canisters into the crowd in an effort to disperse the marchers.

57.   Prior to engaging in this behavior, the "peace" officers did not order the crowd to disperse or give any advance warning that they would be using force against people in the crowd.

58.   Since this event occurred, it has become known that Mayor Frey and the City of Minneapolis selectively enforced the curfew orders, granting informal exemptions to certain individuals and organizations.

59.   As a result of the officers' actions, the crowd began to splinter and, at or
      around 8:50 PM, Grace and Ricardo decided the march had become
      disorganized and they began to feel unsafe.

60.   Grace and Ricardo chose to leave the protesters, near the intersection
      of Lassalle Avenue and W. 15th Street and to return to their car on
      Lake Street and then to their home in St. Paul.

61.   The couple turned around to return home and, at 9:04 PM, they
      crossed over Interstate 94 (by foot) on Nicollet Avenue. Grace took a
      picture of the sunset because it looked particularly beautiful.

62.   At or around 9:10 PM, Grace and Ricardo left Nicollet Avenue and
      proceeded walking south towards Lake Street and their car via 1st
      Avenue S.

63.   At or around 9:24 PM, the couple approached the intersection of 1st
      Avenue S. and Cecil Newman Lane.

64.   When Grace and Ricardo approached the intersection of 1st Avenue S.
      and Cecil Newman Lane, they were approximately 1.4 miles away from
      where they left the protest.

65.   The couple briefly stepped off 1st Avenue onto Cecil Newman Lane
      where they were asked if they needed help by individuals on the porch
      of the apartment building located at 2820 1st Avenue S.

66. Grace and Ricardo declined the invitation from the people at the apartment building and returned to 1st Avenue S., proceeding south along the road's eastern sidewalk.

67. At or around 9:30 PM, Grace and Ricardo encountered Defendant Does 1, 2, and 3, who appeared in the street in front of them.

68. Grace and Ricardo stood on the eastern sidewalk of 1st Avenue S. in the immediate vicinity of a business called A Plus Auto Body.

69. Officers Doe 1, 2 and 3, stood on or near the 1st Avenue S. bridge passing over the Greenway approximately fifteen to thirty feet in front of the couple.

70. At the time Grace and Ricardo encountered the Doe Defendants, it was not yet dark as civil twilight did not occur until 9:26 PM and nautical twilight did not occur until 10:13 PM on May 30, 2020. *See Sunrise and Sunset Minneapolis (May 30, 2020).*[1]

71. Because it was not yet dark, and because Grace and Ricardo were only 5-10 yards from Doe Defendants, it can be safely presumed that the Doe Defendants could see Grace and Ricardo clearly.

72. Neither Grace nor Ricardo was carrying any sort of weapon on their person.

---

[1] Available at: https://www.sunrise-and-sunset.com/en/sun/united-states/minneapolis__mn/2020/may/30.

73.  Neither Grace or Ricardo was wearing clothing which appeared to bulge out or otherwise conceal anything that might be a weapon.

74.  Without issuing a verbal warning, one of the Doe defendants shined a flashlight on Grace and Ricardo, both of whom froze.

75.  Without issuing a verbal command, one of the Doe officers fired his weapon and struck Grace with a non-lethal but extremely injurious projectile just inches below her left eye.

76.  Approximately four seconds elapsed between when Defendants shined the light on Grace and when the shot was fired.

77.  The Doe Defendants did not tell Grace she was under arrest before firing.

78.  The Doe Defendants did not tell Ricardo he was under arrest before firing.

79.  The Doe Defendants did not tell Grace to get on the ground before firing.

80.  The Doe Defendants did not tell Ricardo to get on the ground before firing.

81.  The Doe Defendants did not tell Grace to show them her hands before firing.

82.  The Doe Defendants did not tell Ricardo to show them his hands before firing.

83.  Plaintiff was given no chance to surrender, peacefully or otherwise, to avoid being fired upon.

84.  After being shot in the face with a less-lethal projectile from nearly point-blank range, Grace fell to the ground and Ricardo rushed forward to shield her from any additional shots and to help her return to her feet.

85.  No second shot was fired.

86.  After helping Grace to her feet, Ricardo rushed her away from Defendant Does and towards the apartments located at 2820 1st Avenue S. where several individuals had offered them help.

87.  For unknown reasons, none of the Doe Defendants sought to render aid to Grace.

88.  For unknown reasons, none of the Doe Defendants sought to handcuff Grace or issue a citation to Grace.

89.  Six eyewitnesses report Grace having entered the apartment building at or around 9:30 PM with significant swelling around her eye and a severe laceration on her left cheekbone.

90.  At no point prior to the shooting did Defendant Does verbally notify Grace or Ricardo of their presence.

91.  At no point prior to the shooting did Defendant Does seek to determine whether Grace and Ricardo were lawfully out after curfew (the

emergency declarations contained various exceptions which would make it impossible for an officer to determine on sight whether someone out after curfew was violating the curfew order).

92.  At no point prior to the shooting did Grace or Ricardo move towards the officers in a threatening manner.

93.  At no point prior to the shooting did Grace or Ricardo engage in conduct which could be construed as an attempt to damage property or threaten the safety of any person.

94.  At no point prior to the shooting did officers move to effect an arrest of Grace and Ricardo or to apprehend them.

95.  At the time of the shooting, the sun had set but ambient light remained and the street was not yet entirely dark.

96.  At no point after the shooting did Defendant officers attempt to apprehend Grace or Ricardo.

97.  At no point after the shooting did Defendant officers attempt to render aid to Grace.

98.  Instead, Defendant Doe 1, 2, or 3 shot Grace in the face without a verbal warning and then all three left her to bleed and cry in the street.

99.  At all times mentioned, Defendant Does 1, 2, and 3 were acting under the color of the statutes, ordinances, regulations, customs, and usages

of Defendant Minneapolis and the State of Minnesota under the authority of their respective office as police officers.

100. MINN. STAT. § 629.32 instructs that "[a] peace officer making an arrest may not subject the person arrested to any more restraint than is necessary for the arrest and detention." Accordingly, Minnesotans have a liberty interest in freedom from the use of excessive force grounded in substantive state law.

101. MINN. STAT. § 629.33 instructs that "[i]f a peace officer has *informed* a defendant that the officer intends to arrest the defendant, *and* if the defendant then *flees or forcibly resists* arrest, the officer may use all necessary and lawful means to make the arrest." (emphasis added). Accordingly, Minnesotans have liberty interests in being informed prior to being subjected to police force and to be free from such force unless they resist or attempt to flee. Both of these liberty interests are grounded in substantive state law.

102. Minneapolis PD recently revised its policies to make clear that the least amount of force necessary must be used; this new policy indicates that Minneapolis PD's previous policies allowed excessive force to be used in violation of state statute.

103. Grace received immediate medical care from individuals located in the basement of the apartments at 2820 1st Avenue S. Grace was

incredibly lucky that a team of medics, including a registered nurse, were present there after they themselves had been attacked by MPD officers while attempting to administer aid to injured protestors just after Grace and Ricardo left the area around Lake and Nicollet at around 8:15 PM.

104. Grace and Ricardo remained in the basement of the apartments throughout the evening of May 30, 2020 and the morning of May 31, 2020, and departed shortly after 6:00 AM, when the curfew lifted the next morning.

105. Grace and Ricardo arrived at their car in the morning and drove directly to Regions Hospital where Grace was admitted to the emergency room.

106. Grace received four stitches for her injuries, and a CT scan revealed a zygomatic fracture in her left cheekbone.

## **MPD's customarily excessive force against unarmed and compliant civilians**

107. Minneapolis enforced the emergency order through a massive deployment of National Guard troops and a consortium of law enforcement agencies, all of whom were authorized to use force against anyone outdoors after curfew regardless of whether such use of force was necessary to gain compliance.

108.  Even before curfew was in place, MPD officers maced protesters from their vehicles without warning and despite an absence of threat or justifiable provocation. This occurred on multiple occasions including on May 28, involving Annette Williams, and by a series of MPD police SUVs including vehicle number 352 during broad daylight while exiting Washington Ave onto Interstate 35W.

109.  During the enforcement of the curfew, police officers deployed tear gas against prone, nonresistant misdemeanants.

110.  During the enforcement of the curfew, Minneapolis PD "peace" officers fired "less lethal" projectiles indiscriminately into crowds of peaceful protestors on May 30, 2020.

111.  During the enforcement of the May 30, 2020 curfew, police officers fired "less lethal" paint projectiles at Tanya Kerssen as she stood on her own porch despite an absence of threat or justifiable provocation.

112.  During the enforcement of the curfew, police officers attacked protestors from moving vehicles on May 30, 2020.

113.  On May 30, 2020, police opened fire with "less lethal" projectiles on a clearly marked medical encampment set up to treat injured individuals in the K-Mart parking lot located at 10 W. Lake Street, Minneapolis, MN 55408, despite health care providers compliance with orders to raise their hands.

114.   During the enforcement of the curfew, police officers fired "less-lethal" projectiles at clearly marked press personnel despite a clear exception permitting their presence in public.

115.   Members of the press who were attacked by police officers during this time include, *inter alia*: John Minchillo (May 29, 2020), Molly Hennessy-Fiske (May 30, 2020), Michael George (May 30, 2020), John Marschitz (May 30, 2020), Carolyn Cole (May 30, 2020), Ryan Faircloth (May 30, 2020), Chao Xiong (May 30, 2020), Linda Tirado (May 30, 2020), Ali Velshi (May 30, 2020), Julio-Cesar Chavez (May 30, 2020), Lucas Jackson (May 30, 2020), and Susan Ormiston (May 30, 2020).

116.   During the enforcement of the curfew, police officers kettled protesters in order to prevent their dispersing prior to curfew and then moved in to arrest them, striking protestors with batons and pepper spray. This occurred on May 31, 2020 near the intersection of Washington Ave. and Interstate 35W where nearly 150 protestors were prevented from dispersing prior to curfew and subsequently gassed and arrested en masse.

117.   During the enforcement of the curfew, police officers held arrestees in close proximity to one another despite the government's own social

distancing guidelines implemented in response to the COVID-19
pandemic.

118.    These actions were widely reported by local, regional, and national
news outlets and through social media; Mayor Frey and Chief
Arradondo were aware of the ongoing excessive force complaints.

119.    Photojournalist Lucas Jackson reported "[i]t's not that we were being
shot because we were between cops and protesters. It's that we were
shot at if we were anywhere in line of sight.  I've been hit because I
was in the wrong place before.  I've never been aimed at so
deliberately so many times when I was avoiding it."

120.    Mayor Frey and Governor Walz acknowledged ongoing use of
excessive force used against peaceful protestors as an unfortunate
result of curfew enforcement.

121.    This massive use of force was authorized, either explicitly or tacitly, by
Defendant Minneapolis through its agents: Mayor Frey and Chief
Arradondo. This is evidenced through warnings issued at the time the
curfew was implemented and by the pervasive use of force by MPD and
other law enforcement agencies employed at all times throughout the
relevant time period.

122.    Even if this use of force was not explicitly authorized by Defendant
Minneapolis, it resulted from the city's failure to supervise or provide

adequate instruction to their officers despite their awareness of the ongoing issues.

123. Even prior to the curfew, MPD officers have a long history of engaging in excessive force against unarmed civilians; these represent practices that MPD, and by extension Minneapolis, has long ignored and tacitly approved of.

124. In 2010, MPD officers killed Cornelius Smith, who was suffering a mental health breakdown with multiple taser blasts and an overly aggressive restraint that caused him to lose consciousness.

125. In 2013, Minneapolis resident Terrance Franklin was chased into a basement and shot dead by five MPD officers.

126. In 2014, MPD officers choked, punched, and handcuffed Alfred Flowers before continuing the beating by stomping and kicking him as he lay on the ground.

127. In 2015, Minneapolis resident Jamar Clark was shot and killed by MPD officers.

128. In 2016, Minnesota Vikings player Tom Johnson was maced and tasered after MPD officers initiated a confrontation with him.

129. Again in 2016, MPD officers kicked and struck a handcuffed Thomas Garcia-Orihuela as he lay handcuffed on the ground.

130. In 2017, unarmed Minneapolis resident Justine Ruszczyk was gunned down in her backyard by MPD officers.

131. Again in 2017, one of the officers involved in George Floyd's killing knocked out Lamar Ferguson's teeth after he refused to share the whereabouts of his family members.

132. In 2018, an MPD officer drop-kicked Jeremiah Jermaine Thomas in the chest before additional MPD officers joined in, punching, kneeing, and kicking him and causing a punctured lung, internal bleeding, and fractured ribs.

133. In all of these cases, settlements were reached, meaning Defendant Minneapolis was on notice of MPD's ongoing pattern of reckless violence as the Mayor is notified of all litigation brought against the city and must approve all settlements.

134. In 2019, MPD officers repeatedly tasered Champaigne Lynn Hale and Leonadis John Evans in their backyard, in what was described as a police riot, prompting the county to drop criminal charges against the women. The event was widely reported.

135. Impunity is the norm and of the 2,013 complaints filed against MPD officers in the past seven years, only 31, or 1.5 percent, ended in serious discipline.

136.   MPD's culture accepts and allows the use of excessive force as a customary part of the job.

137.   All MPD officers are represented by the Police Officer's Federation of Minneapolis. The federation provides union representation to all officers and negotiates on their behalf with the city.

138.   The federation's elected president, Lieutenant Robert Kroll ("Kroll"), acts as an unofficial policymaker within the MPD. As the president of the union, Kroll is an important culture maker in the office and he acts as a de facto policy maker for many of the officers. As president, he is elected by MPD officers their affirmative choice of him as a leader reflects on the culture of the department.

139.   Kroll's June 2 statement to federation members underscores his influence throughout the department:

> What has been very evident throughout this process is you have lacked support from the top. I've noted in press conferences from our mayor, our governor, and beyond, how they refuse to acknowledge the work of MPD and continually shift blame to it.  It is despicable behavior.  How our command staff can tolerate it and live with themselves I do not know… Although I have not been visibly present, I am closely monitoring what is occurring.  I commend you for the excellent police work you are doing… I've had numerous conversations with politicians at the state level. I gave a detailed plan of action including a range of 2000 to 3000 National Guard, their deployment allocations throughout our city and St. Paul, in a phone meeting with Senate majority leader Paul Gazelka. I've worked with

other police leaders from New York to Las Vegas to push our messaging on a national level.

These are not the words of a standard lieutenant; they are the words of a man who sets the tone and culture department-wide.

140. Kroll is a member of the City Heat motorcycle club, which has been known to regularly display white supremacist symbols.

141. Minneapolis permitted so called warrior training, which prepares police to do battle with civilians, until 2019.

142. After 2019, the Police Federation, headed by Kroll, offered free warrior training to Minneapolis officers. The union was not subject to censure or reprimand for engaging in this conduct.

143. No efforts were made to prevent officers from engaging in warrior training programs despite a clear awareness regarding its popularity amongst officers and Minneapolis officials' awareness of the propensity to result in violence perpetuated towards citizens.

## **INJURIES**

144. At minimum, the injuries Grace suffered rise to the level of "substantial bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.7a.

145. The injuries Grace suffered also rise to the level of "great bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.8.

146.   Grace suffered significant damage to her face as a result of being

struck with a paint canister, rubber bullet, or other projectile on May

30, 2020.

147.   The following are pictures of Grace's injuries taken shortly after she

was shot in the face by Defendants:



148.   The CT scan Grace underwent on May 31, 2020 showed a zygomatic

fracture in her left cheekbone.

149.   Prior to May 30, 2020, Grace had never had a zygomatic fracture in her

left cheekbone.

150.   Grace's eye also swelled shut almost immediately and she lost all vision

in her left eye for two days and even when it returned, it was initially

fuzzy. This was not a preexisting injury.

151.   Grace continues to experience issues with her vision and her left eye periodically experiences white splotches that make it difficult to see.

152.   Grace also experienced significant lacerations and bruising at the immediate site of the injury to the point that the registered nurse who first responded reported serious concerns about her long-term wellbeing including concerns over the detachment of her retina.

153.   Grace experienced the worst pain of her life as a result of Defendant Does 1, 2, or 3's shooting her in the face and she was severely dazed and shocked in the immediate aftermath of the shooting.

154.   This excruciating pain persisted for nearly a week and continues to affect Grace if she touches the left side of her face or puts any sort of pressure against the socket.

155.   Despite the serious damage to her face, Grace was lucky that immediate medical help was available and that the round did not strike her a few inches higher where it would have certainly rendered her totally blind in one eye.

156.   Grace has experienced anxiety after the shooting, as a direct result of the shooting, and she continues to experience an increased heart rate, sweaty palms, and general anxiety at the sound of sirens or the sight of police officers.

157.   Grace has experienced trouble sleeping in the aftermath of the
shooting, particularly if the sounds of sirens or fireworks are present,
even faintly, through the night.

158.   The shooting has made Grace extremely hesitant to call the police if
she were to need them and it has engendered in her a serious distrust
of officers. In this manner it has deprived her of equal access to justice
and protection.

159.   Grace has incurred significant monetary costs as a result of being shot
in the face by Defendant Doe 1, 2, or 3.

160.   Grace has incurred at least $4,865.15 in medical bills between her visit
to the emergency room, CT scan, medication, professional fees, and
follow up visits.

161.   Grace was forced to miss four shifts at the supermarket where she
works (26 hours) as she recovered from being shot in the face, forcing
her to use $268.75 worth of PTO (21.5 hours) and miss out on an
additional $62.50 in income (4.5 hours).

162.   Grace has suffered extreme emotional distress, in the form of pain and
suffering, as a result of Defendants' intentional actions.

## CLAIMS FOR RELIEF

163. Defendant Doe 1, 2, or 3's unprompted, unnecessary, and unannounced shooting of Grace violated Grace's Fourth Amendment right to be free from unreasonable seizures.

164. Defendants Doe 1, 2, or 3's unprompted, unnecessary, and unannounced shooting of Grace violated Grace's Fourteenth Amendment rights to substantive and procedural Due Process.

165. Defendant Minneapolis' policies and customs of encouraging and tacitly approving of known and excessive force were the moving force behind Defendant Does' conduct in a manner sufficient for liability to attach under *Monell* and *Canton. See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

166. Defendants Doe 1, 2, or 3's unprompted, unnecessary, and unannounced shooting of Grace constitutes a common law battery under Minnesota tort law.

167. Defendants Doe 1, 2, or 3's unprompted, unnecessary, and unannounced discharge of his or her weapon towards Grace constitutes negligence under Minnesota tort law.

168. Defendant Minneapolis' implementation of Emergency Regulation 2020-2-1, as well as its enforcement by Chief Arradondo and Does 1, 2,

and 3, violated Grace's First Amendment rights to Free Speech, Assembly, and her Fourteenth Amendment right to travel and be present in public.

## Count 1: 42 U.S.C. § 1983 – Fourth Amendment Violation

(Plaintiff v. Doe 1, Doe 2 & Doe 3)

169. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

170. By shooting Grace in the face, Defendant Doe 1, 2, or 3 violated her constitutional right to be free from unreasonable seizures and excessive force.

171. "[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

172. In determining what level of force, if any, is appropriate under the Fourth Amendment, the Court must look to the objective reasonableness of the officer's actions based on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

173. Courts should also consider "the availability of alternative methods of capturing or subduing a suspect." *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal citations omitted).

174. The Eight Circuit has "clearly established that use of stun gun on nonviolent misdemeanor arrestee would constitute unreasonable exercise of force." *Brown*, 574 F.3d at 491.

175. Given that the use of a stun gun lies lower on the continuum of force than the use of paint canisters and rubber bullets, the use of such "less lethal" projectiles against a compliant *suspected* misdemeanant, without warning, must also constitute a patently unreasonable use of force as a matter of law.

176. Nothing Grace or Ricardo did can be construed as a threat to Defendant Does 1, 2, or 3.

177. Grace and Ricardo were suspected of nothing more than violating curfew, a misdemeanor offense.

178. Neither Grace nor Ricardo fled or advanced towards officers when a light was shone on them.

179. Accordingly, nothing could justify Defendant Doe 1, 2, or 3 in firing upon Grace with a rubber bullet, paint canister, or alternative less-lethal projectile.

180. Minnesota precedent also indicates that striking a protestor in the chest with a riot baton, without warning, without an attempt to apprehend, and without attempting to render aid precludes a finding of qualified immunity because the "law governing police use of excessive force was clearly established [as early as] 1990." *Baker v. Chaplin*, 517 N.W.2d 911 (Minn. 1994).

181. Due to precedent indicating that Defendant Doe 1, 2, or 3's conduct was unlawful, Defendant officers were aware of the unlawful nature of their conduct.

182. Because of this notice, and because of the unreasonable nature of their conduct, Defendant Does are not entitled to qualified immunity.

183. Moreover, "a state actor may be liable for an unreasonable seizure under the Fourth Amendment if he fails to intervene to prevent the unconstitutional use of excessive force by another official." *Krout v. Goemmer*, 583 F.3d 557, 565 (8th Cir. 2009).

184. The two Doe officers who did not fire upon Grace are also liable for their failure to stop their fellow officer given their concurrent failure to announce themselves, to seek to apprehend Grace and Ricardo, and their subsequent failure to render any aid.

185. Grace suffered serious bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury,

financial injury, emotional trauma, loss of access to justice, and pain and suffering.

186.   Thus, Defendants violated the Fourth Amendment and 42 U.S.C. § 1983.

## Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Grace's Substantive Due Process Rights

(Plaintiff v. Doe 1, Doe 2 & Doe 3)

187.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

188.   When a defendant acts deliberately, an objective standard is appropriate in the context of excessive force claims brought pursuant to the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

189.   Whether the force used against an individual violated substantive Due Process rights under the Fourteenth Amendment turns on "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. 389, 397 (2015).

190. None of these factors apply to Grace who was standing frozen and unarmed before Defendant Does 1, 2, and 3.

191. The force applied to Grace was sufficient to cause grievous injury, rising to the level of great bodily harm, to her face and head.

192. Grace made no effort to resist officers, made no motion towards Does 1, 2, or 3, and did not carry or appear to carry anything that suggested she might be armed.

193. Grace suffered a fractured skull, temporary blindness, immense pain and suffering, and lasting psychological, nerve, and nervous injuries as a result of being shot in the face.

194. Defendant officers Doe 1, 2, and 3 made no attempt to deescalate the confrontation and instead resorted immediately, and without warning, to the use of "less lethal" projectiles, the very name of which illustrates their inappropriateness in this context.

195. Grace and Ricardo were walking quietly down a deserted street and carried nothing that could be construed as a weapon.

196. Grace and Ricardo were some 30 feet away from the Doe Defendants and made no movement towards them and did not resist officers in any way.

197. Grace suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury,

financial injury, emotional trauma, loss of access to justice, and pain and suffering.

198.   Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 3: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Grace's Right to Procedural Due Process

(Plaintiff v. Doe 1, Doe 2 & Doe 3)

199.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

200.   "[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Buckley v. Ray*, 848 F.3d 855, 864 (8th Cir. 2017).

201.   Grace had such a liberty interest created by MINN. STAT. § 629.33 to be informed that she was subject to seizure before the arresting officer applied any force in seizing her.

202.   Grace had a liberty interest in freedom from the use of *any* force by a police officer unless she fled or forcibly resisted. *Id.*

203.   Grace also had a liberty interest under MINN. STAT. § 629.32 to be free from "any more restraint than is necessary for [her] arrest and detention."

204.  Both of these interests relate to Grace's constitutional right to be free from physical seizure without due process of law, a right which is amongst the most important rights guaranteed by the U.S. Constitution.

205.  Shooting Grace without warning amounted to a punishment for her suspected misdemeanor crime—*i.e.*, violating curfew—without the benefit of a trial.

206.  By shooting Grace without warning, Officer Doe 1, 2, or 3 played prosecutor, judge, jury, and executioner in a manner which deprived Grace of her right to notice that was "reasonably calculated, under all the circumstances, to apprise [her] of the pendency of the action." *Crum v. Vincent*, 493 F.3d 988, 993 (8th Cir. 2007).

207.  Defendant Does 1, 2, and 3's failure to effectuate an arrest after shooting of Grace also leads to the inevitable conclusion that their action constituted a summary determination of guilt and execution of sentence in the form of delivering a "less lethal" rubber bullet or paint canister to Grace's face at a high rate of speed and with great physical force.

208.  Grace was provided no notice of the officer(s)' intent to carry out this punishment and was accordingly deprived of her procedural due process rights.

209. While procedural "[d]ue process is flexible and calls for such procedural protections as the particular situation demands," *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (internal citations omitted), by failing to inform Grace of their intention to seize or shoot her, Defendant Does 1, 2, and 3 deprived Grace of any process whatsoever.

210. Given that the statutes in question demand she be given notice and satisfy particular criteria prior to having her person forcefully seized, she was due, at the very least, notice of the officers' intent to seize her (before being shot in the face) as required by state statute. *See* MINN. STAT. § 629.33.

211. Use of physical force by ambush and under color of law is not consistent with even the most basic principles of procedural Due Process.

212. Even if Grace had been notified that she was about to be placed under arrest or shot in the face, which she was not, she did not flee or pose any reasonably objective threat to officers, and accordingly, she was deprived of her liberty interest in freedom from the use of force under MINN. STAT. §§ 629.33 and 629.32.

213. As force is only authorized in the event of flight or forceful resistance, it was not necessary in Grace's case and, accordingly, being shot in the

face with a rubber bullet or paint canister was unnecessary and infringed upon her liberty interests in freedom from forceful seizure.

214. Grace suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

215. Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 4: *Monell* and *Canton* Municipal Liability

### (Plaintiff v. Minneapolis)

216. For years, MPD officers have engaged in a policy and custom of using excessive force against unarmed civilians. The pervasiveness of this custom and notice to Minneapolis officials indicates it has been tacitly approved of by the City of Minneapolis.

217. This custom has included the repeated and pervasive use of tasers and other "less-lethal" impact weapons against unarmed civilians posing no threat to officers.

218. During the period from May 28, 2020 to May 31, 2020, MPD officers engaged in a custom or policy of firing "less lethal" projectiles indiscriminately at any and all civilians in Minneapolis' public spaces.

219. During the period from May 28, 2020 to May 31, 2020, MPD officers engaged in a custom or policy of using excessive force and impact weapons against suspected misdemeanants despite clear legal notice of the constitutional infirmity of such practice.

220. These customs and policies are reflected in the widespread use of force as well as warnings issued at the time suggesting that force would be used and that such practices has been authorized by Minneapolis, Mayor Frey, and Chief Arradondo.

221. Minneapolis officials, including Mayor Frey and Chief Arradondo approved of this excessive force, either explicitly through use of force policies or tacitly given the widespread reporting of extreme violence employed by MPD. Minneapolis' failure to address the issue despite its notice constituted tacit approval at least, and potentially express authorization.

222. MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force, subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and

special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the city." (MPD Policy Manual Sec. 1-301 (citing City Charter reference-Chapter 6, Section 1)).

223. Mayor Frey and Chief Arradondo had final policymaking authority with regard to establishing written policies and training programs governing the conduct of MPD officers performing policing functions on behalf of Minneapolis.

224. Minneapolis officials were aware of the customs and longtime *de facto* policies in place throughout MPD via settlements and media coverage but did nothing to reprimand the continued use of warrior training or, except in the most extreme cases, follow up on misconduct.

225. Minneapolis, through Chief Arradondo, and Mayor Frey exhibited the requisite "deliberate indifference" to constitutional rights to illustrate a custom or policy and for municipal liability to attach to police officer's conduct. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

226. This indifference was evidenced by city officials' recognition of the effect the curfew order would have on lawful protesters and their acknowledgement that legitimate, nonviolent, constitutionally protected protestors would be harmed during enforcement of the orders.

227. The implementation of the curfew order resulted in the foreseeable and widespread use of excessive force.

228. This level of force was authorized by city officials and the pervasiveness of the conduct illustrates a persistent and widespread custom throughout MPD of engaging in such practices as required for a showing of municipal liability. *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

229. Despite their knowledge of MPD's customs and practices, Minneapolis officials, including Frey and Arradondo, failed to implement measures to address them and as a result, the abuses set forth in paragraphs 107 to 143, and more, occurred during the implementation of the Mayor's curfew orders.

230. Pervasive use of excessive force, including the use of rubber bullets and paint canisters against unarmed civilians, was widely reported by media and addressed by city and state officials in press conferences indicating they were well aware of the violations, yet police violence continued, and if anything, escalated throughout the period between May 28, 2020 and May 31, 2020.

231. The force authorized and the curfew order itself were facially unconstitutional as their immense breadth and failure to permit

alternative forms of expression rendered them improper limitations of fundamental rights.

232. "A municipality has no immunity from liability under § 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability." *Owen v. City of Independence*, 445 U.S. 622, 622 (1980). Accordingly, Minneapolis' municipal liability must attach because the policies themselves were unconstitutional.

233. Grace suffered great bodily harm as a direct and proximate result of Defendants' actions, including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

## **Count 5: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Grace's Right to Freedom of Movement and Presence in Public**

### (Plaintiff v. Minneapolis, Doe 1, Doe 2 & Doe 3)

234. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

235. Defendants' above-described conduct violated Grace's rights to be present in public under the Fourteenth Amendment to the United States Constitution. *City of Chicago v. Morales*, 527 U.S. 41, 53, (1999).

236. By criminalizing the public presence of each and every Minneapolis resident or visitor for nearly half of the day, three days running, Mayor Frey's emergency regulation unduly burdened the fundamental rights of some 416,000 Minneapolis residents, many of whom lived nowhere near the sites of unrest centered around Lake Street on the city's south side and Broadway Avenue on the north.

237. The massive overbreadth of this order renders it facially unconstitutional due to the enormous scale of constitutional infringements and its effect on the rights of more than 100,000 Minneapolis residents whose neighborhoods were entirely untouched by the unrest in the wake of George Floyd's murder.

238. The massive overbreadth of this order also renders it facially unconstitutional as applied to Grace.

239. Mayor Frey's order was implemented on behalf of Defendant Minneapolis and enforced by Chief Arradondo and Does 1, 2 and 3.

240. As a direct and proximate result of the enforcement of Mayor Frey's unconstitutional emergency regulation, Grace suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

241.  As a direct and proximate result of Mayor Frey's order, Grace also suffered a constitutional injury in the form of a limitation on her fundamental right to remain in public for innocent purposes.

242.  Thus, Defendants violated the First Amendment and 42 U.S.C. § 1983.

## Count 6: 42 U.S.C. § 1983 – First Amendment Violation of Grace's Rights to Freedom of Speech and Assembly

### (Plaintiff v. Minneapolis)

243.  Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

244.  Defendants' above-described conduct violated Plaintiff's rights to freedom of speech, assembly, and association under the First Amendment to the United States Constitution.

245.  Emergency Regulation 2020-2-1 was simply too broad to satisfy the strictures of constitutional inquiry.

246.  Defendants' interest is maintaining order was adequately served, or could have been adequately served, by measures implicating far less onerous constitutional limitations than the sweeping curfew orders employed.

247.  As outlined above, the unrest and fires that prompted Mayor Frey's order were confined to the area around the Third Precinct, along Lake

Street on the city's south side and along Broadway Avenue on the city's north. Between and around these areas, much of the city was relatively calm and, in those areas, a sweeping order was unnecessary.

248.   Because Mayor Frey's order implicated rights secured under both the First and Fourteenth Amendments and because other options such as simply deploying the National Guard or administering a more localized ban on activity in affected areas offered less rights restrictive alternatives, Mayor Frey's emergency declaration imposing a city-wide curfew was not properly tailored to Defendants' interests and it cannot withstand a constitutional challenge.

249.   Because the curfew order was specifically intended to suppress speech during certain hours, it swept up a substantial amount of legitimate speech unrelated to the restoration of order, and it left few if any alternative avenues for expression available, particularly for those like Grace who work during the day.

250.   Mayor Frey's emergency curfew order constituted an unconstitutional limit of Grace's First Amendment rights under the "time, place and manner" analysis.

251.   As a direct and proximate result of the enforcement of Mayor Frey's unconstitutional emergency regulation, Grace suffered great bodily

harm including but not limited to: physical injury, financial injury,
emotional trauma, loss of access to justice, and pain and suffering.

252.  As a direct and proximate result of Mayor Frey's order, Grace also
suffered a constitutional injury in the form of a limitation on her
fundamental right to speak, assemble with likeminded protestors and
seek redress for MPD's many grievances.

253.  Thus, Defendants violated the First Amendment and 42 U.S.C. §
1983.

### Count 7: Minn. Stat. § 466.02 – Battery

### (Plaintiff v. Minneapolis, Doe 1, Doe 2 & Doe 3)

254.  Plaintiff realleges and incorporates herein by reference all preceding
and all subsequent paragraphs of this Complaint.

255.  Supplemental jurisdiction is proper given that this claim arises from a
"common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S.
725 (1966).

256.  Minnesota Law defines the tort of battery "as an intentional
unpermitted offensive contact with another." *Paradise v. City of
Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

257.  Defendant Doe 1, 2, or 3 committed such a battery when one of them
aimed his weapon at Grace and pulled the trigger causing his rubber

bullet or paint canister to offensively contact Grace's face causing significant injury.

258. Because Officer Doe 1, 2, or 3 acted intentionally and with reason to believe that shooting an unarmed misdemeanant with a rubber bullet or paint canister was legally prohibited, they are not entitled to official immunity.

259. The aforementioned precedent indicating that the use of "less lethal" force such as a taser, as well as the manufacturers warnings that paint canisters are not to be used without face and neck protection, provided Officer Doe 1, 2, and 3 with notice that firing a "less lethal" round at the face of an unarmed misdemeanant was unlawful and precludes a finding of official immunity.

260. Minnesota law holds that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." MINN. STAT. § 466.02. This is subject to several exceptions including, pertinently, "claim[s] based upon an act or omission of an officer or employee, *exercising due care*, in the execution of a valid or invalid statute, charter, ordinance, resolution, or rule." *Id.* at subd.5 (emphasis added).

261. As Officer Doe 1, 2, or 3 failed to exercise due care when they fired upon Grace without warning, municipal Defendant Minneapolis is not exempt from liability for Officers Doe 1, 2, and 3. *See Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005) (applying Minn. law) (precluding summary judgement granting immunity to either municipality or officer where decision turned on disputed fact determination).

262. As a direct and proximate result of Defendant Doe 1, 2, or 3's action Grace suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

263. Thus, Defendants committed an actionable intentional tort under Minnesota law.

### Count 8: Minn. Stat. § 466.02 – Negligence

(Plaintiff v. Minneapolis, Doe 1, Doe 2 & Doe 3)

264. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

265. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

266. In shooting Grace with a "less-lethal" projectile, Officers Doe 1, Doe 2, and Doe 3 "fail[ed] to act as a reasonable and prudent police officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

267. Officer Doe 1, 2, and 3 owed Grace the duty of apprehending her in a constitutionally reasonable manner.

268. Officers Does 1, 2, and 3 owed Grace a duty not to unnecessarily harm her in the execution of her arrest.

269. Officer Doe 1, 2, or 3 breached both of these duties when he or she pointed his/her weapon towards Grace and pulled the trigger.

270. As a direct and proximate result of Officer Doe 1, 2, or 3's conduct, Grace was struck in the face with a rubber bullet or paint canister.

271. As a direct and proximate result of Defendant Doe 1, 2, or 3's action, Grace suffered great bodily harm including but not limited to, physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

272. Thus, Defendants committed an actionable negligence tort under Minnesota law.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.   With regards to claims 1, 2, 3, 5, and 6 (1983 claims), grant an award of compensatory damages totaling $250,000 against one or more Defendants as compensation for Defendants' actions which caused Grace to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Grace's ongoing medical costs and her loss of wages resulting from Defendant(s)' actions.

B.   With regard to claim 4 (*Monell* claim), grant an award of compensatory damages totaling $250,000 against Defendant Minneapolis as compensation for Defendants' actions which caused Grace to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Grace's ongoing medical costs and her loss of wages resulting from Defendant's actions.

C.   With regards to claims 1, 2, 3, 5, and 6 (1983 claims), grant an award of punitive damages in the amount of $5,000,000, respectively, against Defendant Does 1, 2, and 3 in order to punish their reckless and callous indifference towards Grace's rights under the U.S. Constitution and Minnesota State law, and to deter other members of MPD from committing similar grievous offenses in the future.

D.     With regards to claims 1, 2, 3, 4, 5, and 6 (1983 & *Monell* claims), grant an award of reasonable attorney's fees, non-taxable expenses and costs pursuant to 42 U.S.C. § 1988, or under any other relevant attorney fee statute.

E.     With regards to claims 7 and 8 (state law claims), grant an award of compensatory damages totaling $250,000 against Defendant Does 1, 2, 3 (or Defendant Minneapolis pursuant to MINN. STAT. § 466.02 or MINN. STAT. § 3.736), or any combination thereof, as compensation for Defendants' actions which caused Grace to experience extreme pain and suffering, substantial emotional and psychological damages, substantial bodily harm, and significant constitutional injuries. These damages are also necessary to obviate Grace's ongoing medical costs and her loss of wages resulting from Defendant(s)' actions.

F.     Grant such other relief as may be just and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.

DATED: September 15, 2020           Respectfully submitted,

/s/ *Nico Ratkowski*

NICO RATKOWSKI
MN Attorney ID: 0400413
Contreras & Metelska, P.A.

200 University Avenue W., STE 200
Saint Paul, Minnesota 55103
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

ANU JASWAL
MN Attorney ID: 0401299
Contreras & Metelska, P.A.
200 University Avenue W., STE 200
Saint Paul, Minnesota 55103
P: (651) 771-0019
F: (651) 772-4300
anu@contrerasmetelska.com

*Attorneys for Plaintiff*

## <u>VERIFICATION OF COMPLAINT</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the
   attorneys for Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and
   belief, and he believes same to be true, and he further states that the
   sources of this information and belief are documents provided to him by
   Plaintiff, Defendant(s), and third-party witnesses.


DATED: September 15, 2020          Respectfully submitted,

                                   */s/ Nico Ratkowski*
                                   Nico Ratkowski
                                   MN Attorney ID: 0400413
                                   Contreras & Metelska, P.A.
                                   200 University Avenue W., STE 200
                                   Saint Paul, Minnesota 55103
                                   P: (651) 771-0019
                                   F: (651) 772-4300
                                   nico@contrerasmetelska.com

                                   *Attorney for Plaintiff*